OPINION
RENDELL, Circuit Judge:
Congress passed the Civil Asset Forfeiture Reform Act of 2000 (“CAFRA”), Pub.L. No. 106-185, 114 Stat. 202, as a “reaction] to public outcry over the government’s too-zealous pursuit of civil and criminal forfeiture” and as an “effort to deter government overreaching.” United States v. Khan, 497 F.3d 204, 208 (2d Cir.2007).[1] To that end, Congress crafted a statutory scheme that requires the Government, if it has seized property that someone else purports to own, to file a complaint for judicial forfeiture within 90 days of receipt of a claim (known as a “seized asset claim”) or else to return the property. 18 U.S.C. § 983(a)(3)(A). CAFRA also imposes on the Government a heightened burden of proof to establish its right to the property in such proceedings. United States v. Sum of $185,336.07 U.S. Currency, 731 F.3d 189, 196 (2d Cir.2013).
Here, the Government failed to follow CAFRA’s procedure, which requires it to file a complaint for judicial forfeiture within 90 days of the filing of a seized asset claim. Accordingly, we will reverse the portion of the District Court’s July 29, 2009 order denying the appellants’ cross- *445 motion for partial summary judgment concerning the applicability of CAFRA. We will vacate all orders at issue on appeal that postdate the July 29, 2009 order, including the jury verdict and the District Court’s order entering judgment. Further, we will remand for the District Court and instruct it to grant the appellants the relief required by this Opinion.
I. Background
The ownership of the property in question and how the appellants obtained possession of it are hotly disputed, but the facts relevant to the disposition of this appeal are not. The property consists of ten coins that were minted in 1933. Each coin is a double eagle, which is a $20 gold coin. The 1933 double eagle is alleged to be “the most valuable ounce of gold in the world” and “America’s most beautiful coin.” (J.A. 609.) There were 445,500 double eagles minted in 1933; however, those coins were generally not released into circulation. Instead, in an effort to halt the banking crisis during the Great Depression, President Franklin D. Roosevelt issued an executive order in 1933 removing gold coins from circulation. See Exec. Order No. 6102 (Apr. 5, 1933).[2] The U.S. Mint (“Mint”) was forbidden from releasing any more gold coins, and, over the next few years, began melting the coins into gold bricks. Nonetheless, a number of 1933 double eagles left the Mint; some were unlawfully smuggled out and at least two left the Mint lawfully.
One 1933 double eagle was sold to King Farouk of Egypt, a coin collector, in 1944. This coin had been unlawfully smuggled out of the Mint, but the Government “had improvidently issued an export license,” which muddied the issue of who rightfully possessed the coin. (J.A. 28.) In 1995, an English coin dealer, Stephen Fenton, purchased that coin for approximately $200,000. Fenton then contacted a coin dealer in the United States, who subsequently became a confidential informant for the U.S. Secret Service (“Secret Service”). The confidential informant convinced Fenton to bring the coin to the United States in 1996. The Secret Service seized the coin from Fenton in New York City, and litigation ensued. The Government ultimately settled with Fenton, agreeing to sell the coin at auction and divide the proceeds equally. The Fenton coin was auctioned in 2002 for nearly $7.6 million.
The appellants in this case are Joan Langbord and her sons, Roy and David Langbord (collectively, the “Langbords”). Shortly after the Fenton coin sold at auction, Joan Langbord allegedly discovered ten 1933 double eagles (the “Double Eagles”) in a safe deposit box originally belonging to her deceased father, Israel Switt. Several decades earlier, the Secret Service suspected that Switt, an antique dealer in Philadelphia, and George McCann, a former Philadelphia Mint cashier, unlawfully smuggled 1933 double eagles out of the Philadelphia Mint; however, Switt’s involvement in this scheme was never proven.
In 2004, the Langbords’ counsel informed the Mint about the Double Eagles that the Langbords had discovered. The Langbords sought an agreement similar to the Fenton coin compromise. The Mint’s attorneys stated that they “would be willing to discuss the matter” and that they were “amenable to a discussion” on that *446 topic. (J.A. 142.) The Langbords, explicitly reserving their rights to the Double Eagles, made the coins available to the Government for the sole purpose of authentication. (J.A. 806.) Shortly thereafter, the agencies involved — i.e., the U.S. Attorney’s Office for the District of Columbia, the Secret Service, the U.S. Department of the Treasury (“Treasury”), and the Mint — met to discuss how to proceed. A memorandum summarizing the meeting states that “[a]ll the agencies involved, with the exception of the U.S. Mint, are in favor of pursuing forfeiture.” (J.A. 818.) Only the Mint “assertfed] that the coins are government property and should be returned [to the Mint] without the need for forfeiture.” (Id.)
The Double Eagles were authenticated, and the Treasury sided with the Mint, deciding not to institute a judicial civil forfeiture proceeding. When the Langbords’ counsel requested return of the Double Eagles, the Mint’s counsel wrote to him, stating, “[t]he United States Mint has no intention of seeking forfeiture of these ten Double Eagles because they already-are,' and always have been, property belonging to the United States; this makes forfeiture proceedings entirely unnecessary.” (J.A. 823.) In response, the Langbords’ counsel submitted a “seized asset claim” on September 9, 2005, demanding the return of the Double Eagles or the institution of a judicial civil forfeiture pro- ’ ceeding. (J.A. 828-35.) As described below, a seized asset claim starts the process whereby the Government must either institute a judicial civil forfeiture proceeding or return the seized property. Nevertheless, in response to the seized asset claim, the Mint responded that it was “returning these documents ... without action,” again stating that “[t]here is simply no basis for the Government to initiate forfeiture proceedings on property to which the United States holds title.”[3] (J.A. 837.)
In the face of the Government’s refusal, the Langbords instituted this civil action in December 2006. The Langbords asserted two claims for violations of the Administrative Procedure Act (“APA”), a claim for violation of CAFRA, a Fifth Amendment claim, a Fourth Amendment claim, a claim for mandamus, and two claims under the Federal Tort Claims Act (“FTCA”) for replevin and conversion.
The parties filed cross-motions for summary judgment. On July 29, 2009, the District Court ruled in favor of the Government on the CAFRA claim, holding that CAFRA’s 90-day deadline in § 983(a)(3) did not apply because it applies only to nonjudicial civil forfeitures and no such forfeiture had occurred here. It reasoned that: (1) a “non-judicial civil forfeiture ‘is commenced when the Government sends notice of the forfeiture proceeding to potential claimants’ ”; (2) “the Government never sent [the Langbords] such a notice”; and thus (3) “the Government never began an administrative forfeiture proceeding[4] and therefore the require *447 ments of § 983(a) [namely, the 90-day deadline] do not apply.” (J.A. 146 (quoting Stefan D. Cassella, Asset Forfeiture Law in the United States 143 (1st ed.2007) [hereinafter Cassella First Edition]).) The District Court did find, however, that the Government had violated the Langbords’ Fourth Amendment right against unreasonable seizures and their Fifth Amendment due process right by taking the Double Eagles contrary to the parties’ agreement. It held that the remedy for these constitutional violations was for the Government either to return the coins or to institute a judicial civil forfeiture proceeding, which is the same result that § 983(a)(3) demands, but without the 90-day deadline. The District Court granted the Government’s summary judgment motion on the APA claims and postponed ruling on the FTCA claims.
As ordered by the District Court, the Government sought leave to file a judicial civil forfeiture complaint on September 28, 2009. The complaint alleged that the Double Eagles were “embezzled, stolen, purloined, knowingly converted to private use, or taken from the United States Mint in Philadelphia without authority, and [were] concealed and retained with the intent to convert [them] to private use or gain” in violation of 18 U.S.C. § 641. (J.A. 1178.) The Government’s proposed complaint also included a declaratory judgment claim that “the disputed Double Eagles were not lawfully removed from the United States Mint and that accordingly, as a matter of law, they remain property of the United States.” (J.A. 1180.)
Over the Langbords’ objection, the District Court granted leave to file portions of the complaint, including the forfeiture claim and the declaratory judgment claim. It also ruled that the Langbords had a right to a jury trial on the forfeiture claim but not on the declaratory judgment claim. A jury trial was held on the forfeiture . claim, and the jury returned a verdict for the Government on July 20, 2011, finding that the Double Eagles had been stolen from the Mint. As a result of the jury verdict, the District Court entered judgment for the Government on its forfeiture claim, as well as on the related declaratory judgment claim.
On appeal, the Langbords argue that the District Court erred by granting summary judgment for the Government on the issue, of CAFRA’s 90-day statutory deadline for filing a judicial civil forfeiture action. They also argue that the District Court erred by allowing the Government’s declaratory judgment claim to proceed and by denying the Langbords’ request to have the declaratory judgment claim tried by a jury. In addition, the Langbords appeal the District Court’s admission of certain evidence at trial,[5] argue that the District Court improperly instructed the jury on criminal intent, and urge that the Government cannot seize property as a result of an 18 U.S.C. § 641 violation — i.e., stolen government property — unless the property was stolen or embezzled after 1948 when § 641 was enacted.
*448 II. Jurisdiction and Standard of Review
The District Court had jurisdiction over the Langbords’ claims pursuant to 28 U.S.C. §§ 1331, 1346(b)(1), 1356, and 1361 and 5 U.S.C. § 702; it had jurisdiction over the Government’s claims pursuant to 28 U.S.C. §§ 1345 and 1355(a). We have jurisdiction pursuant to 28 U.S.C. § 1291.
We “employ a plenary standard in reviewing orders entered on motions for summary judgment, applying the same standard as the district court.” Blunt v. Lower Merion Sch. Dist, 767 F.3d 247, 265 (3d Cir.2014). We review questions of law de novo. United States v. Mallory, 765 F.3d 373, 381-82 (3d Cir.2014).
III. Discussion
A. The CAFRA Violation
The Government was required either to file a judicial civil forfeiture complaint or to return the Double Eagles within 90 days of receipt of the Langbords’ seized asset claim under 18 U.S.C. § 983(a)(3)(A). Because the Government failed to do so, the Langbords are entitled to the return of the Double Eagles.
The Government’s position as to why it did not need to fulfill its obligation under § 983(a)(3)(A) has morphed over time. When the Government initially returned the Langbords’ seized asset claim without action, it claimed that it did not need to abide by CAFRA because the property was stolen government property. Now, the Government’s principal argument is that it did not need to abide by CAFRA because it never sent a notice to the Langbords that it was pursuing forfeiture, thereby relieving it of its obligation to institute a judicial civil forfeiture proceeding. Neither of these arguments nor any of the Government’s remaining arguments have merit.
The Government’s original argument that stolen government property falls outside the protections of CAFRA is incorrect for a simple reason: Congress has specifically enumerated theft or embezzlement of government property as one of the crimes to which CAFRA applies. Congress has provided that “[t]he following property is subject to forfeiture to the United States: .... [a]ny property, real or personal, which constitutes or is derived from proceeds traceable to ... any offense constituting ‘specified unlawful activity’ (as defined in section 1956(c)(7) of this title).” 18 U.S.C. § 981(a)(1)(C) (emphasis added). “[Sjpecified unlawful activity” includes “an offense under ... section 641 (relating to public money, property, or records).” Id. § 1956(c)(7)(D). Section 641, the very statute alleged in the Government’s complaint to have been violated, criminalizes the theft or embezzlement “of any record, voucher, money, or thing of value of the United States or of any department or agency thereof.” Id. § 641 (emphasis added). The Government claims that the Double Eagles are government property— i.e., things of value of the United States. (J.A. 1178.) Clearly, CAFRA applies when the underlying property is stolen government property.
The Government’s original argument also appears to have been based on the notion that the Langbords voluntarily surrendered the Double Eagles to the Government. However, on summary judgment, the District Court concluded that the Government’s seizure of the coins was unconstitutional, and the Government has not cross-appealed this ruling.[6] The Lang *449 bords turned the Double Eagles over to the Government for the sole purpose of authenticating them, and they “specifically reserve[d] all rights and remedies with respect to the Coins.” (J.A. 806.) As the District Court found, the Langbords’ “letter communicated that [they] did not intend the transfer to be an unconditional, permanent surrender,” and “once [they] became aware that the Government intended to keep the coins permanently, they promptly requested their return.” (J.A. 150.)
The Government’s seizure of property — even under a theory that the property ultimately belongs to the Government — can violate the Fourth and Fifth Amendment. See Soldal v. Cook Cnty., III., 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (“A ‘seizure’ of property, we have explained, occurs when ‘there is some meaningful interference with an individual’s possessory interests in that, property.’ ”) (quoting United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)); see also Lesher v. Reed, 12 F.3d 148, 150 (8th Cir.1994) (“The Leshers’ constitutional right against unreasonable seizures is not vitiated merely because the [government] believed the dog belonged to the [Little Rock Police Department].”). Here, the Langbords had a possessory right that they preserved in writing when they turned the Double Eagles over for authentication. Even if the Double Eagles ultimately were stolen government property, the Government’s seizure of them was unconstitutional, as the District Court determined.
With this original line of argument rejected, we turn to the Government’s main assertion on appeal — namely, that all it needs to do to avoid CAFRA’s protections is to refrain from sending notice that it is commencing a forfeiture proceeding. As a corollary, the Government argues that it can avoid CAFRA by unequivocally stating in its communication with the people whose property was seized that it is not seeking forfeiture. If the Government seizes property claimed by someone else— whether it be money, a car, or even a house — the Government argues it can avoid the protections Congress sought to put in place simply by saying, “we are not seeking forfeiture.”
The Langbords are correct in urging that we reject these arguments. The Government was required either to return their property or to institute a judicial civil forfeiture proceeding within 90 days of the Langbords’ submission of a seized asset claim. See 18 U.S.C. § 983(a)(3)(A) (“Not later than 90 days after a claim has been filed, the Government shall’file a complaint for forfeiture ... or return the property----”). This is what CAFRA envisions: the Government cannot unilaterally ignore a seized asset claim. Instead, the Government must either return the seized property or file a complaint in court to seek forfeiture of the seized property within 90 days of receipt of the seized asset claim. Our dissenting colleague takes issue with this proposition, urging that, although the Government was required to have followed the 90-day deadline in § 983(a)(3), its failure to do so does not require the Government to return the Double Eagles to the Langbords. This is a novel argument, never posited by the Government, and, as we discuss below, not supported by any relevant case authority.[7] Moreover, it rewrites the statute.
*450 Section 983(a) contains three independent subparts: in (a)(1) it imposes a 60-day timeline for the Government to send written notice of forfeiture in certain cases; in (a)(2) it creates a mechanism by which a person claiming seized property can file a seized asset claim, whether or not the Government has sent or is required to send notice; and in (a)(3) it imposes a 90-day timeline, after a seized asset claim has been filed, for the Government to respond either by returning the property or by filing a complaint in court for judicial forfeiture.
The District Court incorrectly reasoned that the seized asset claim provision, § 983(a)(2), and the 90-day provision, § 983(a)(3), are activated only if written notice is sent' under § 983(a)(1). This is wrong. The District Court combined § 983(a)(1) with (a)(2) and (a)(3) and held that, in any forfeiture situation in which the Government does not send notice under § 983(a)(1), no one is able to file a seized asset claim pursuant to § 983(a)(2). But a careful reading of the statutory provisions demonstrates that this is not the case:
(l)(A)(i) Except as provided in clauses (ii) through (v), in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute, with respect to which the Government is required to send written notice to interested parties, such notice shall be sent in a manner to achieve proper notice as soon as practicable, and in no case more than 60 days after the date of the seizure....
(2)(A) Any person claiming property seized in a nonjudicial civil forfeiture proceeding under a civil forfeiture statute may file a claim with the appropriate official after the seizure....
(3)(A) Not later than 90 days after a claim has been filed, the Government shall file a complaint for forfeiture ... or return the property pending the filing of a complaint....
(3)(B) If the Government does not — (i) file a complaint for forfeiture or return the property, in accordance with subparagraph [ (3) ](A) ... the Government shall promptly release the property pursuant to regulations promulgated by the Attorney General, and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.[8]
18 U.S.C. § 983(a) (emphasis added).
Section 983(a)(1)(A) provides for the manner and timing of notice that the Government must use in those “nonjudicial civil forfeiture proceeding^] ... with respect to which the Government is required to send written notice.” Id. § 983(a)(1)(A)® (emphasis added). This provision recognizes that another law— separate from CAFRA — provides that notice must be sent in some, but not all, nonjudicial civil forfeiture proceedings. See 19 U.S.C. § 1607(a).[9] Section 1607(a) *451 does not speak to the manner or timing of the notice; that is what § 983(a)(1) does. The Government errs in urging that, when notice of forfeiture is either not required or not given within 60 days of a seizure under § 983(a)(1), that insulates the Government from its obligation under § 983(a)(3) to act within 90 days of receiving a seized asset claim. Instead, § 983(a)(2) and (a)(3) act independently from § 983(a)(1): whether notice has been filed has nothing to do with the Government’s duty to respond to a.seized asset claim. Therefore, § 983(a)(1) is irrelevant to the analysis that we must conduct under § 983(a)(2) and (a)(3).
The text of § 983(a)(3) provides that, “[n]ot later than 90 days after a claim has been filed, the Government shall file a complaint for forfeiture ... or return the property.” 18 U.S.C. § 983(a)(3)(A) (emphasis added). And the requirements for filing a claim are laid out in § 983(a)(2), not § 983(a)(1). “Any person claiming property seized in a nonjudicial civil for-. feiture proceeding under a civil forfeiture statute may file a claim with the appropriate official after the seizure.” Id. § 983(a)(2)(A) (emphasis added). Here, the Government’s seizure of the property is rightfully considered a nonjudicial civil forfeiture proceeding. See Stefan D. Cassella, Asset Forfeiture Law in the United States 10 (2d ed.2013) [hereinafter Cassella Second Edition] (“Basically, an administrative forfeiture begins when a federal law enforcement agency with statutory authority in a given area (e.g., DEA in a drug case, FBI in a fraud case, ATF in a firearms case) seizes property discovered in the course of an investigation.”).[10] In other words, it is when the agency “seizes property” that the “administrative forfeiture begins.” Id. Because a nonjudicial civil forfeiture proceeding occurred when the Government seized the coins, the Langbords had the right to submit a seized asset claim under § 983(a)(2), and, when they did, they triggered the Government’s obligation under § 983(a)(3) to bring a judicial civil forfeiture proceeding or to return the property within 90 days.
The Government’s insistence that “[t]he statute says that an administrative forfeiture proceeding is initiated by the government providing notice of the seizure” is baffling. (Oral Arg. Tr. 52:7-9, Nov. 19, 2014.) But the District Court agreed. Quoting from a section of a treatise that does not discuss the applicability of § 983(a)(3), the District Court held that “[a] non-judicial civil forfeiture proceeding ‘is commenced when the Government sends notice of the forfeiture proceeding to potential claimants.’” (J.A. 146 (quoting Cassella First Edition, supra, at 143).) However, as the language of § 983(a)(1)(A)(i) makes clear, only in some nonjudicial civil forfeiture proceedings un *452 der a civil forfeiture statute[11] is the Government required to send written notice. Otherwise, the subsection would not need to include the phrase, “in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute, with respect to which the Government is required to send written notice to interested parties." 18 U.S.C. § 983(a)(1)(A)(i) (emphasis added). It cannot be that a case where no notice of forfeiture is required is nonetheless beholden to the Government’s notice as starting the administrative process. The frivolity of the Government’s position is demonstrated by the fact that it would afford the Government total discretion to avoid CAF-RA altogether by unilaterally deciding not to notify the putative owner of the seizure.
Further proof of why the Government is incorrect appears in § 983(e)(1), which provides that “[a]ny person entitled to written notice in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute who does not receive such notice may file a motion to set aside a declaration of forfeiture with respect to that person’s interest in the property.” Id. § 983(e)(1) (emphasis added). Section 983(e)(1) is triggered only when there is a “nonjudicial civil forfeiture proceeding” in which the Government has not sent notice of its intent to pursue forfeiture. But if such a proceeding can be commenced only when the Government has sent notice of its intent, then the statute makes no sense. In other words, if a nonjudicial civil forfeiture proceeding commences only when the Government sends notice that it is instituting such a proceeding, then § 983(e)(1), which provides a remedy in any nonjudicial civil forfeiture proceeding in which the Government was required but failed to give notice of its intent to pursue forfeiture, would be nonsensical. Therefore, it cannot be the case that a nonjudicial civil forfeiture proceeding is initiated only when the Government sends notice that it intends to commence such a proceeding.[12] Section 983(a)(1) does not initiate a nonjudicial civil forfeiture proceeding; rather, it provides the manner of giving notice when the provisions requiring notice apply.
Instead, a “nonjudicial civil forfeiture proceeding” commences when the Government has seized property. Cassella Second Edition, supra, at 10. When the Government has seized property, then the person from whom the property was seized has the right to file a seized asset claim pursuant to § 983(a)(2)(A), thereby triggering the 90-day deadline in § 983(a)(3)(A). If the Government has not seized property, then it has no obligation to respond to a seized asset claim. Thus, the horrors described by the Government at oral argument — e.g., pro se prisoners filing seized asset claims for jailhouse tele *453 visions — is of no concern here. Because no seizure occurred in those situations, the Government would not have to file a judicial forfeiture action, even if someone files a seized asset claim. It is only when a seizure occurs that there is a “nonjudicial civil forfeiture proceeding” and thus the Government must respond.[13] Here, the Government unquestionably committed a seizure (and an unconstitutional one at that), so it was required to respond to the Langbords? seized asset claim, either by filing a judicial complaint within 90 days or by returning the property. See 18 U.S.C. § 983(a)(3)(A). Instead, the Government forced the Langbords to commence this decade-long ordeal for the return of the Double Eagles.
The Government’s remaining arguments as to why the 90-day deadline should not apply also lack merit.[14] These arguments are: (1) the value of the Double Eagles prevented them from being subject to CAERA; (2) the Mint was not authorized to bring a forfeiture action; and (3) § 983(a)(3)(A)’s “good cause” exception applies.
First, the Government’s argument that the Double Eagles .were not subject to forfeiture because their value exceeded $500,000 is unavailing. This argument relies on 19 U.S.C. § 1607(a), which states only that “the appropriate customs officer shall cause a notice of the seizure of such articles and the intention to forfeit ... to be published for at least three successive weeks in such manner as the Secretary of the Treasury may direct.” 19 U.S.C. § 1607(a). One of the instances in which notice is not required is when the value of the property exceeds $500,000. Id. § 1607(a)(1). Because the Government assumes that notice is required to commence a forfeiture proceeding and because § 1607(a) demonstrates that no notice was required in this case, as the Double Eagles’ value allegedly exceeds $500,000, the Government argues that no forfeiture has occurred here. This argument fails. Section 1607(a) is relevant to determining whether the Government was obligated to provide notice of forfeiture within 60 days pursuant to 18 U.S.C. § 983(a)(1), but it does not relieve the Government of its 90-day deadline in § 983(a)(3). Notice is not *454 a prerequisite for persons to file a seized asset claim and trigger the 90-day deadline in § 983(a)(3).
Second, the Government’s argument that its conduct did not amount to a nonjudicial civil forfeiture since the Mint was not authorized to conduct a forfeiture under 31 U.S.C. § 9703 fails because the Mint is an entity within the Treasury and was not the only agency involved here. Section 9703(o)(l) provides a definition for “Department of the Treasury law enforcement organization,” a definition which includes the Secret Service but excludes the Mint. 31 U.S.C. § 9703(o)(1).[15] A separate subsection provides that “property and currency shall be deemed to be forfeited pursuant to a law enforced or administered by a Department of the Treasury law enforcement organization if-it is forfeited pursuant to — ... (B) a civil administrative forfeiture proceeding conducted by a Department of the Treasury law enforcement organization.” Id. § 9703(m)(2)(B). But the Secret Service is the agency that “seized” the Double Eagles on September 22, 2004 and that continued to have custody of the coins until months later. (J.A. 818.) The Secret Service is authorized to conduct a forfeiture pursuant to § 9703. That the Treasury ordered the Secret Service to give the Double Eagles to the Mint (J.A. 821) does not insulate the Government from CAFRA. Section 9703 sought to limit various agencies’ ability to conduct seizures; it does not give agencies that are not authorized to conduct seizures a carte blanche ability to avoid CAFRA.
Third, § 983(a)(3)(A)’s “good cause” exception does not excuse the Government’s failings here. Pursuant to the statute, “[n]ot later than 90 days after a claim has been filed, the Government shall file a complaint for forfeiture ..., except that a court in the district in which the complaint will be filed may extend the period for filing a complaint for good cause shown or upon agreement of the parties.” 18 U.S.C. § 983(a)(3)(A) (emphasis added). We cannot help but read this language (“shall file ... except ... may extend”) to mean that the good cause exception allows the Government to seek an extension of time only before the 90-day period expires. See United States v. Funds from Fifth Third Bank Account, No. 13-11728, 2013 WL 5914101, at *9 (E.D.Mich. Nov. 4, 2013) (“Given the narrow language used [in § 983(a)(3)(A)], this Court concludes that the Government has to seek the extension before the limitations period passes and that it cannot seek a ‘retroactive extension.’ ”); see also United States v. One 1991 Ford Mustang LX, 909 F.Supp. 831, 834 (D.Colo.1996); United States v.1986 Ford Bronco, 782 F.Supp. 1543, 1546 (S.D.Fla.1992); United States v. One White 1987 Tempest Sport Boat, 726 F.Supp. 7, 9 (D.Mass.1989). The period cannot be extended if it has already passed.[16]
*455 Even if the statute did permit retroactive extensions, the Government would not be entitled to an extension for two reasons. First, the Government’s delay was not minor; the Government failed to file a complaint until September 28, 2009— four years and nineteen days after the Langbords filed their seized asset claim— and only did so under court order. See United States v. $39,480.00 in U.S. Currency, 190 F.Supp.2d 929, 932 & n. 9 (W.D.Tex.2002) (permitting a retroactive extension when the government was one day late). Second, according to the Government’s own documents, after the Secret Service seized the Double Eagles, “[a]ll the agencies involved, with the exception of the U.S. Mint, [were] in favor of pursuing forfeiture.” (J.A. 818.) Thus, the Government knew that it was obligated to bring a judicial civil forfeiture proceeding or to return the property, but refused to do so.[17] As a result, the Government cannot show good cause.[18]
Accordingly, a nonjudicial civil forfeiture proceeding occurred here, and the Government missed the 90-day deadline under § 983(a)(3). On September 9, 2005, when the Langbords submitted their seized asset claim, the 90-day period in § 983(a)(3) commenced. See 18 U.S.C. § 983(a)(3)(A). The Government failed to return the Langbords’ property or institute a judicial civil forfeiture proceeding within 90 days. Having failed to do so, it must return the Double Eagles to the Langbords.[19]
*456 B. The Declaratory Judgment
Given this conclusion, the District Court should not have ordered the declaratory judgment claim to proceed, and indeed we must vacate the declaratory judgment. The declaratory judgment entered by the District Court was the following:
The disputed Double Eagles were not lawfully removed from the United States Mint and accordingly, as a matter of law, they remain the property of the United States, regardless of (1) the applicability of CAFRA to the disputed Double Eagles, (2) Claimants’ [i.e., the Langbords’] state of mind with respect to the coins, or (3) how the coins came into Claimants’ possession.
(J.A. 52-53.) The District Court opined that “the declaration concerns a different — and broader — set of legal rights than the narrow question decided by the jury, which was simply whether the Government had proven its claim of forfeiture of the 1933 Double Eagles.” (J.A. 53-54.) However, the District Court recognized that “the jury’s verdict [on the forfeiture claim] dictates the outcome of the declaratory judgment claim” and that it made the declaration “solely on the basis of facts necessarily (although implicitly) found by the jury.” (J.A.52.)
We will vacate the declaratory judgment for two reasons. First, the declaratory judgment proceeding cannot be recognized because, having missed CAFRA’s 90-day deadline, the Government cannot use a declaratory judgment proceeding to circumvent that deadline. We have held that a “statute of limitations can[not] be circumvented merely by ‘[djraping [the] claim in the raiment 'Of the Declaratory Judgment Act.’ ” Algrant v. Evergreen Valley Nurseries Ltd. P’ship, 126 F.3d 178, 185 (3d Cir.1997) (quoting Gilbert v. City of Cambridge, 932 F.2d 51, 58 (1st Cir.1991)). Algrant’s focus is on whether the claims are “barred by a statute of limitations applicable to a concurrent legal remedy,” which means that the declaratory judgment is “essentially predicated upon the same cause of action.” Id. at 184-85. Here, as the District Court acknowledged, the forfeiture and declaratory judgment claims are undoubtedly predicated upon the same cause of action, and, therefore, the declaratory judgment claim cannot be used to circumvent CAFRA’s 90-day deadline.
Second, the declaratory judgment proceeding cannot be recognized because CAFRA amounts to a “special statutory proceeding.” Federal Rule of Civil Procedure 57 states that “[t]he existence of another adequate remedy does not preclude *457 a declaratory judgment that is otherwise appropriate.” Fed.R.Civ.P. 57. However, the Advisory Committee’s Note qualifies Rule 57 by stating that a “declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of case, but general ordinary or extraordinary legal remedies, whether regulated by statute or not, are not deemed special statutory proceedings.” Fed.R.Civ.P. 57 advisory committee’s note. The Supreme Court has confirmed that declaratory relief “should not be granted where a special statutory proceeding has been provided.” Katzenbach v. McClung, 379 U.S. 294, 296, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).
Although no court has opined that CAF-RA provides for a special statutory proceeding, conversely, no court has held that CAFRA does not provide for a special statutory proceeding. We hold that it does. To date, “a handful of categories of cases have been recognized as ‘special statutory proceedings.’” N.Y. Times Co. v. Gonzales, 459 F.3d 160, 166 (2d Cir.2006). “These include: (i) petitions for habeas corpus and motions to vacate criminal sentences; (ii) proceedings under the Civil Rights Act of 1964; and (iii) certain administrative proceedings.” Id. (internal citations omitted). “Each of these categories involved procedures and remedies specifically tailored to a limited subset of cases, usually one brought under a particular statute.” Id.
Here, there is no doubt that the realm of civil forfeiture involves “procedures and remedies specifically tailored to a limited subset of cases.” See id. CAFRA provides a structured scheme, which gives the parties multiple deadlines to follow and puts a heightened burden on the Government. CAFRA, like the Civil Rights Act of 1964, involves procedures and remedies tailored to a limited subset of cases and preserves individual rights. Given this tailored scheme, even if the Government had filed a judicial action within 90 days from when the Langbords filed their seized asset claim (and therefore we did not have the Algrant issue of the Government using the declaratory judgment claim to circumvent CAFRA’s 90-day deadline), the Government could not use the declaratory judgment to circumvent the specific remedy and heightened burden that CAFRA provides. Based on either of these alternative grounds, we must vacate the declaratory judgment.[20]
C. The Remaining Issues
Because we will vacate the declaratory judgment, we do not address whether the jury should have decided that claim. Furthermore, given that we will also vacate the judgment on the forfeiture claim, we do not address the multiple trial issues raised by the Langbords, nor do we address the mens rea required for a violation of 18 U.S.C. § 641, nor whether forfeiture is permitted for a § 641 violation where the theft or embezzlement of Government property occurred before § 641 was enacted in 1948.
IV. Conclusion
At the insistence of the Mint and against the wisdom of the Secret Service and multiple other agencies, the Government opted to ignore CAFRA. Now, the Langbords are entitled to the return of the Double Eagles. We will reverse in pertinent part the District Court’s July 29, 2009 order, which denied the Langbords’ cross-motion for partial summary judgment concerning the applicability of CAFRA, and will va *458 cate all orders at issue on appeal that postdate the July 29, 2009 order,[21] including the jury verdict and the District Court’s order entering judgment. We will remand for the District Court to order the Government to return the Double Eagles to the Langbords.

. See also H.R.Rep. No. 106-192, at 10 (1999) ("Civil asset forfeiture does not just impact civil liberties and property rights. It can work at total cross purposes with the- few professed public policy goals of the federal government.”).

. Executive Order 6102 allowed people to continue to possess "[g]old coin and gold certificates in an amount not exceeding in the aggregate $100 belonging to any one person,” as well as "gold coins having a recognized special value to collectors of rare and unusual coins.” Exec. Order No. 6102, at § 2(b) (Apr. 5, 1933).

. The Mint's terse letter also denied that the Government had seized the Double Eagles, an assertion which, as described below, the District Court correctly rejected. (See J.A. 837 ("As you and your client are aware, there has been no seizure of any property that is owned by, or that could be claimed to be owned by, your client.”); J.A. 838 ("In short, there has been no seizure of property; your client voluntarily surrendered to the United States property belonging to the United States.”).) This denial starkly contrasts with a contemporaneous internal Government memorandum that conceded that a seizure had occurred. (See J.A. 818 (“On September 22, 2004, the [Secret Service] seized ten coins referred to as 1933 Gold Double Eagle Coins'....”).)

. As used here, "administrative forfeiture” is synonymous with “nonjudicial civil forfeiture.” -

. The Langbords persuasively argue that the hearsay-within-hearsay rule, Fed.R.Evid. 805, does apply to ancient documents admitted pursuant to Rule 803(16), contrary to the District Court’s holding. Although we do not reach the issue, the District Court appears to have been mistaken. See United States v. Hajda, 135 F.3d 439, 444 (7th Cir.1998) ("These documents are more than 20 years old and they were properly authenticated, so they are exceptions to the hearsay rule admissible under Rule 803(16) of the Federal Rules of Evidence. However, this admissibility exception applies only to the document itself. If the document contains more than one level of hearsay, an appropriate exception must be found for each level.”).

. Regardless of whether the Government could have taken an interlocutory appeal of the District Court’s July 29, 2009 summary judgment order, the Government could have *449 cross-appealed at the conclusion of the case, after the jury trial. It did not.

. We note, further, that of the approximately thirty cases cited in Parts I and II of the dissent, only one was ever referred to in any *450 of the briefing — cited in a footnote in the Government’s Brief for an unrelated issue. As we discuss below, the jurisprudence the dissent cites is off-point, dealing with a different provision of CAFRA, § 983(a)(1), and even entirely different statutes. See infra note 19.

. The dissent points to the phrase, “return the property pending the filing of a complaint,’’ in § 983(a)(3)(A), as creating ambiguity as to the Government’s obligations. (See Diss. Op. at 459.) However, there is no question that the Government did not return the Double Eagles pending the filing of a complaint. Therefore, the Government did not comply with § 983(a)(3)(A), which then requires that "the Government shall promptly release the property ... and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.’’ 18 U.S.C. § 983(a)(3)(B).

. Notice is required in the following situations:
*451 (1) the value of such seized vessel, vehicle, aircraft, merchandise, or baggage does not exceed $ 500,000;
(2) such seized merchandise is merchandise the importation of which is prohibited;
(3) such seized vessel, vehicle, or aircraft was used to import, export, transport, or store any controlled substance or listed chemical; or
(4) such seized merchandise is any mone- . tary instrument within the meaning of section 5312(a)(3) of title 31 of the Unied States Code; ....
19 U.S.C. § 1607(a).

. While most forfeitures result from the Government’s seizure of property derived from illegal activity, CAFRA covers stolen government property in the hands of third parties, as was explained above. See 18 U.S.C. § 981(a)(1)(C) (cross-referencing 18 U.S.C. § 1956(c)(7), which cross-references 18 U.S.C. § 641).

. There is no dispute that the Government acted "under a civil forfeiture statute.” The definition of "civil forfeiture statute” is "any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense.” 18 U.S.C. § 983(i)(1). There are five enumerated exceptions, none of which applies here. See id. § 983(i)(2).

. To assert that a nonjudicial civil forfeiture proceeding occurs only when the Government sends notice, the Government relies upon cases interpreting the 60-day notice requirement of § 983(a)(1), which do not address the applicability of the 90-day requirement in § 983(a)(3). See, e.g., United States v. Approximately $1,305,105 in Assorted Silver Bars & Gold & Silver Coins, No. 12-C-7505, 2013 WL 453195, at *2-3 (N.D.Ill. Feb. 6, 2013), rev’d, No. 13-1452 (7th Cir. July 22, 2013); United States v. Assets Described in “Attachment A", No. 6:09-cv-1852, 2010 WL 1893327, at *6 (M.D.Fla. May 11, 2010); United States v. $147,900, No. 1:06-cv-197, 2009 WL 903356, at *4 (M.D.N.C. Mar. 31, 2009), vacated in part, 450 Fed.Appx. 261 (4th Cir.2011); DWB Holding Co. v. United States, 593 F.Supp.2d 1271, 1272 (M.D.Fla.2009).

. (See Oral Arg. Tr. 59:4-15 ("The other problem with this notion that somebody can create their own forfeiture proceeding by filing a seized asset claim is we would be bombarded by litigation.... All the prisoners who say, [y]ou know, that TV set on the wall is mine, I declare it. Here’s a seized asset claim. You have 90 days to file a judicial forfeiture against me, when the government never initiated any forfeiture at all because the TV set [was never theirs] — we can go on and on with examples.”).) This example is off-topic because the Government did not seize the TV set, and, therefore, no nonjudicial civil forfeiture proceeding has occurred. Accordingly, the Government would have no obligation to respond to the seized asset claim.

. The Government has not argued that the Langbords waived their right to CAFRA’s 90-day deadline by consenting to the forfeiture proceeding, which the District Court ordered as a remedy for the Government’s unconstitutional seizure of the Double Eagles. Accordingly, the Government has waived any potential waiver argument. See Freeman v. Pittsburgh Glass Works, LLC, 709 F.3d 240, 250 (3d Cir.2013) (“[A] party can waive a waiver argument by not making the argument below or in its briefs.”). Regardless, the Langbords have clearly and repeatedly raised the argument that the Government violated the 90-day deadline in § 983(a)(3). (See, e.g., J.A. 628, 775-78.) We note that this is why there was no "agreement of the parties” as to the Government's late filing of the forfeiture complaint. See 18 U.S.C. § 983(a)(3)(A) ("Not later than 90 days after a claim has been filed, the Government shall file a complaint for forfeiture ..., except that a court in the district in which the complaint will be filed may extend the period for filing ... upon agreement of the parties.”).

. We note an inconsistency in the U.S. Code: there are two separate statutes both identified as 31 U.S.C. § 9703.

. Congress included the "good cause” exception to "make it unnecessary for the government, as it often must under current law, to file a complaint and then immediately request a stay under Rule 26, Federal Rules of Civil Procedure, or under other statutory authority, to avoid jeopardizing a criminal case.” H.R.Rep. No. 105-358(1), at 45 (1997) (footnote omitted). Congress explained that "the court should grant an extension of time where the filing of the complaint, which is required to recite the factual basis in some detail, would reveal facts concerning a pending investigation, undercover operation, or court-authorized electronic surveillance, or would jeopardize government witnesses.” Id. at 44 (footnote omitted). Furthermore, "the court could grant the extension to allow the government to include the forfeiture in a criminal indictment, and thus avoid the ne *455 cessity of initiating parallel civil and criminal forfeitures.” Id. Congress’s reasons for including the good cause exception are certainly not applicable here.

. We note that an unjustified mistake of law can hardly be considered "good cause.” See Green v. Humphrey Elevator & Truck Co., 816 F.2d 877, 884 (3d Cir.1987) ("We need not decide here, the parameters of the 'good cause’ exception to Rule 4(j) for it is clear that an unjustified misunderstanding of the requirements of the law will not suffice.”).

. The Government incorrectly states that the District Court found good cause here. The District Court stated no more than that "the Government might still have had an opportunity to file a judicial forfeiture action” under the good cause exception. (J.A. 148 n. 3 (emphasis added).) However, it did not find good cause, nor could it have.

. While the dissent refers to a myriad of cases purportedly contradicting the reasoning and the result we embrace, those cases are easily distinguishable, and the impact of CAF-RA’s specific language in § 983(a)(3) could not be clearer. The dissent’s argument — i.e., that the Government should have followed § 983(a)(3) but that its failure does not lead to the return of the Langbords’ property — is a novel position that was not urged by the Government. Moreover, the statutes that are the subject of the cases cited in the dissent have little in common with CAFRA. See, e.g., Dolan v. United States, 560 U.S. 605, 130 S.Ct. 2533, 177 L.Ed.2d 108 (2010) (Mandatory Restitution Act); Shenango Inc. v. Apfel, 307 F.3d 174 (3d Cir.2002) (Coal Act). It relies on forfeiture cases that do not involve § 983(a)(3) at all. See, e.g., Garcia v. Meza, 235 F.3d 287 (7th Cir.2000); United States v. Giraldo, 45 F.3d 509 (1st Cir.1995); Lopez v. United States, 863 F.Supp.2d 127 (D.Mass.2012); DeSaro v. United States, No. 06-cv-20531 (S.D.Fla. Aug. 8, 2006). It relies on cases that describe whether a statutory deadline is jurisdictional, which is relevant for situations in which the claimant failed to timely argue that the 90-day deadline in § 983(a)(3) required the return of the property, with the claimant instead making the § 983(a)(3) argument in, e.g., a Rule 60 motion to vacate a judgment. See, e.g., United States v. Vazquez-Alvarez, 760 F.3d 193 (2d Cir.2014) (per curiam); United States v. Wilson, 699 F.3d 789 (4th Cir.2012); United States v. Martin, 662 F.3d 301 (4th Cir.2011). Here, in contrast, the Langbords have pressed this argument since day one. See supra note 14. And it relies on cases interpreting the 60-day notice deadline in § 983(a)(1). See, e.g., United States v. $11,500.00 in U.S. Currency, 710 F.3d 1006 (9th Cir.2013); United States v. $114,031.00 in U.S. Currency, No. 06-cv-21820, 2007 WL 2904154 (S.D.Fla. Oct. 4, 2007); Salmo v. United States, No. 06-12909, 2006 WL 2975503 (E.D.Mich. Oct. 17, 2006); *456 Manjarrez v. U.S. Dep’t of the Treasury, No. 01-7530, 2002 WL 31870533 (N.D.Ill. Dec. 19, 2002). The 60-day notice deadline in § 983(a)(1) is fundamentally different from the 90-day deadline in § 983(a)(3) because, if the Government misses § 983(a)(1)'s 60-day deadline, CAFRA specifically allows the Government "to commence a forfeiture proceeding at a later time.” 18 U.S.C. § 983(a)(1)(F). There is no analogous provision that gives the Government a second chance if it misses the 90-day deadline in § 983(a)(3) or otherwise excuses the failure to act. Congress could have included such a provision, but it did not. As noted by Wilson — a case relied upon by the dissent — "the time limit imposed on the gov-eminent by § 983(a)(3) is mandatoiy.” 699 F.3d at 791. "If the Government does not file a complaint or take other action within 90 days as required, it must 'release the property pursuant to regulations promulgated by the Attorney General, and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.’ ” Id. at 795 (emphasis added) (quoting 18 U.S.C. § 983(a)(3)(B)). In that case, Wilson lost merely because he raised his § 983(a)(3) argument too late, i.e., in a Rule 60 motion to vacate the judgment. See id. at 797 ("Wilson forfeited his limitations argument by not raising it during the forfeiture proceedings.”).

. Given this disposition, we do not address the Langbords’ remaining arguments as to why the declaratory judgment must be vacated.

. We will affirm the earlier order dated May 11, 2009, which denied both the Langbords’ and the Government’s motions to exclude expert witnesses. We express no opinion as to whether the expert testimony at trial was appropriate.